Welcome. Judge Joe Flatt is joining us by telephone today from Jacksonville, and we'll ask any questions he may have and participate in the conference and decision of this case. That said, U.S. v. Bazantes, Ms. Juan. Good morning. May it please the court. I represent Mr. Arbalez and Mr. Bazantes. The fall state statements alleged in the indictment were not material under 18 U.S.C. 1001, nor were they within the jurisdiction of the United States. What about their red flag argument? The red flag argument about they would have been a red flag? Your Honor, I believe it's a specious argument. The CDC, as with everyone else who's in the contracting industry, knows that drywall workers are subcontractors. On this project, there were some days four or five, some days 80. No person, no company in the United States, to my belief, certainly not within the state of Georgia, has 80 employees on their staff who— They wanted to have to have a fake payroll. It wasn't a fake payroll, actually, Your Honor. I thought that's what they called it. That's what they were called by the government. What happened? Just to explain. The drywall workers who were known within the industry to be independent contractors, because nobody employs 80 of them in a company, were hired on the job, some four or five, some 80, 60, 40, depending on the day or the week. And the IOWAS was told by their contract and by their employer, their employer, IOWAS had Mulkey. Mulkey said to them, you've got to put your workers on this form because you have to be able to show that you have met the Davis-Bacon Act and you have met that in terms of you paid your employees the prevailing wage and you haven't taken out any deductions that are illegal. They give them this form and they go, you need to fill this out. And that's exactly what they did. I dropped a footnote in my brief, Your Honor, that it's arguable that these weren't even false statements. This was a Labor Department form that's required to be filed in order to show Davis-Bacon. They never referred to them as fake and real? Pardon? They, being the defendants, never referred to them as fake and real? They, the defendants, did not believe at the time they filled these out that they were... I'm sorry, it's a real simple question. Yes, I don't... Did they ever refer to them as real or as fake employees? During their testimony at trial, I believe that the government asked them things about did you file these fake ones or did you know about these fake ones and they would either answer yes or no. I'm sorry, I thought they had a classification system. Their letters, W2.Real and W2F2CHK. Yes, and I'm trying to explain, Your Honor, why they had to do that. When they were originally hired on the contract... I don't want to know why they had to do that. I want to know whether that stood for real and fake. I believe, Your Honor, that... Is real some kind of anachronism? I just don't understand what R stands for, E and A and L stands for? If I could explain. There were two sets that were done by a man who was one of the bookkeepers. What they were trying to show was, this is what... Ms. Wilde. Yes. It is an extraordinarily simple question. What does R, E, A, L stand for, regardless... Real. Okay. What does F2CHK stand for? I'm not exactly sure. And your question to me was whether the defendant testified that they were fake books. No. Right? I asked you whether they ever referred to categories, classifications, or employees as real and fake. They might have, Your Honor. I would have to really look back to see if they actually did that. What does real refer to? Who was that referring to? What was that referring to? I just need to explain that... If you would answer my question first, you can tell me why it doesn't matter. But answer my question first. What was real? There were books that were able to show that the independent contractors were paid the prevailing wage and bacon. They were also, at the same time, treated as independent contractors because they were. And they were paid their wages. They were also given a separate check. And the ones that wanted to have the separate check put in to the... That's what was... I will proceed with the assumption that you can't explain it. Well, I'm trying to explain it. Well, you can't explain it in a way I can understand it. Okay. I'm asking you why they had to have two classifications. One of which was denoted real. The other of which wasn't, but was marked with a letter that starts the word fake. Right. Their employee made up those books. And I'm trying to explain to Your Honor why that had to happen. And why it did develop. Why don't you just tell me what it stands for? I don't remember exactly. Real, I think, was what they were actually paid. And I don't remember what F or whether my client really ever knew what that was. I don't remember. But that wasn't what they were actually paid. If they were both what they were actually paid, you wouldn't have two. Well, it was what they were actually paid. If I could explain. In the industry, my client was a drywall broker. Because no business has 80 drywallers. They go out and get what is essentially day laborers. And they have them come to the job. And they pay them either by the day or by the week. Everybody knows that. Beck knows that. He's a general contractor. I'm assuming CDC knows that. Because they put together buildings all the time. So when they go to go on a project, when my client entered into the contract with Mulkey. Mulkey said, okay, I need to have a bunch of workers. I need you to fill out Davis-Bacon forms. So my client said, okay. And my client submitted forms. And the forms they submitted were the certified payrolls. On the certified payrolls, they accurately represented what the deductions would be. They were only legal ones in what their salary was. They were only legal ones how much hours they worked. Everything on there was actually accurate. They had to provide those as part of their contract with Mulkey, which has nothing to do with the CDC. They presented those forms because they were required to under their contract to show what the deductions were. And they gave that to their client, and the client knew what the deduction was. The problem in this case is the CDC and the government was trying to, after the fact, put a round peg in a square hole. Because they were trying to say, okay, we want a building built. And we want a building built. It's got to have drywall workers. So we need like 80 of them someday. We need a contract that we're going to get this done. Mulkey enters into a private contract with my client. And my client provides the workers, which have to be independent contractors because there is no one on earth who has 80 employees. Everybody knows that. They can't be employees. That's not a fake thing. That's just life. You can't get a building built if you're going to wait around to find a contractor who has 80 employees. So what they did was what they had to do. They hired out day laborers to come do the work. In this case, they filled out the payrolls. The payrolls were the false statements, not any kind of bank records or any bookkeeping. It was the payroll records. Those payroll records were Labor Department Davis-Bacon records. Those were supposed to go to Mulkey. They have nothing to do with the CDC. The indictment charged that there were false statements made to the CDC. Then when we come up on appeal, I guess realizing, no, there weren't false statements intended to be made to the CDC, the government argues, well, these were false statements to the Labor Department. That was not charged. Did the CDC's project manager know the truth? Well, they got all the payrolls. Did the CDC's project manager who testified at trial know the truth? Whether he knew that all drywallers were independent contractors, I don't know. You said the CDC knows it. If the CDC knows it, wouldn't the CDC project manager who deals with drywallers know it? I don't think he was ever asked the question, do you know whether they are? But you're telling me things that I don't think are in the record, which is what everybody knows. I'm asking you, since you're on off-record territory now, did the CDC project manager who testified at least implicitly to the contrary know that? I don't know whether the CDC did, but Mr. Boudreau, Judge Boudreau, he did testify to that. He testified that in the industry, everybody knows they're independent contractors. But the CDC project manager who was in charge of the project testified that if those records had disclosed truthfully what was going on and that had been discovered, they would have halted the project and notified the Department of Labor to do an investigation. Did he not? He did. He absolutely did testify that. And you could credit that testimony? Jury could credit that testimony. And if it credited that testimony, it could find that those records were material because they evaded an investigation that would otherwise have been conducted. Your Honor, no, because in this case, these records, when he testified that he would have set up red flags, he was asked specifically, well, what would you have done at that point? There was nothing that the CDC, the CDC was not a party. They would have tipped off the Department of Labor prompting an official investigation. That's exactly what he testified to. Which brings me to the materiality is also within the jurisdictional argument. The low case. I understand your separate argument about that. But what I'm telling you is there was evidence at trial that a jury, if it credited it, which was its prerogative, could have found and made a difference, the false statements. But I'm telling you that based on the record, which was there was a contract that was entered into by the CDC and the CDC entered the contract with BAC, it was over with. It was a fixed $65 million. Project manager's lying. It might have sent red flags. What I'm saying is it couldn't have done anything about it. It would have prompted, according to the project manager, a halt to the project and a DOL investigation. It would not have changed anything. He might have thought, I will stop this. But we know that there was no IRS violation. We know there was no Labor Department violation. You're telling us now how the DOL investigation would have come out. Right. He could say anything. That doesn't mean it wouldn't have stopped the project and prompted an investigation, which would have been a change in what was occurring. And that testimony was also contradicted by the fact that they had received— Up to the jury. Right. Yes, no. Yes, no. Jury gets to decide. If Your Honor is not convinced by the materiality argument, let me move to the jurisdictional argument, which is unassailable. Go to Lowe. Judge Choflat's opinion in Lowe controls this case. Lowe is almost identical. In our case, it's a sub of a sub. I believe in Lowe it was just a sub. But in Lowe, the majority opinion—I'm sorry, Blankenship was Judge Choflat's case. He was relying on Lowe, a 1944 decision, which is controlling. The Lowe decision makes it very clear there you didn't even have the sub of a sub. You had a situation where somebody was working on a government contract with the Alabama dry dock and shipyard. That government contract, it was clear that the payrolls were being paid by the government directly. Directly. And this court held that there was no jurisdiction in that case. Relying on that case, the earlier precedent, this court in Blankenship held that Lowe controls and that when you have a situation where there is a subcontract and there is no direct privity with the government, you do not have federal jurisdiction. It's an expansion to do that beyond what 1001 would allow. That 1001 jurisdiction is dictated by Rogers, which is a Supreme Court decision. It covers all matters confined to the authority of a federal agency. A department or agency has jurisdiction in the sense that it has power to exercise authority in a particular situation. But why is that not this situation? Just as Judge Carnes has gone through and talked about, that if the CDC had known the truth, they would have alerted the Department of Labor and the Department of Labor could have shut down the project during an investigation. Why is that not authority to act on the defendant? First of all, the Department of Labor couldn't have shut it down because there was no Davis-Bacon violation. And the Department of Labor— Wait, wait, wait. You say that. There is evidence in the record. It's not the law according to Ms. Wong. It's evidence in the record that they could and would have done that. Well, there's evidence in the record there was no Davis-Bacon violation. And number two— There's evidence there was. I mean, you can't say, don't worry about jurisdiction and don't worry about materiality because let's argue another issue. The fact that they would have stopped the project is enough to support an inference of materiality. If that were the case, then Blankenship would have come out otherwise. Because the U.S. Department of Transportation had the same authority to shut down their own project. That's not the point. The point is you've gone over your time. We'll give you your full three minutes in reply, and we'll hear from Mr. Huska. Thank you. Did I get that name nearly right? Yes, Your Honor. That's closer than most. Good morning, Your Honors. May it please the Court. Ryan Huska representing the United States. I did want to start briefly on the materiality issue. The testimony at trial was that two separate payrolls had to be created because the defendants had to fill out these certified payroll forms. In other words, knowing that they were going to have to list deductions, they had to calculate and keep two sets of payrolls so that they could lie on the forms and put the deductions even when they were not. What I gather is they thought it was material. That's correct, Your Honor. Otherwise, there wouldn't have been two sets of books. That's correct, Your Honor. And they knew that that mattered to the Department of Labor because if they didn't do that, they would have asked questions and it would have prompted an audit or interviews and all the things that the CDC and the Department of Labor were entitled to do, both by the contract and also by the statutes and regulations here that empowered them and frankly directed the Department of Labor to come up with a regulatory scheme that required these sorts of payrolls subject to, and this is in the statute, subject to 1001. And Defendant Arbelez in particular, both defendants testified in this case and Defendant Arbelez testified when pressed. He said, now he did say, contrary to all of the language on the forms themselves, contrary to all of the office workers' testimony, contrary to the bookkeeper who the defendants got to calculate these deductions that they were not in fact withholding from their workers' wages. Defendant Arbelez testified and when pressed, he initially said, yeah, we just gave those forms to Mulkey. We didn't know where they were going. And when asked, who told you to put tax deductions on the form, he said the customers. He was asked, who told you, which customer then told you to lie on those forms? Well, no one told us to lie on the forms. Which customer told you to put inaccurate information on that form? And he conceded, no one. He conceded we chose to put that information on the form. What cause? Because they knew that if they told— I'm sorry, what did he testify was the reason? There was no reason. He could not give a reason other than that Mulkey required the forms. But he could not give a reason for why they did not actually truthfully fill it out. Had they truthfully filled it out, you would have had a line of workers and there would have been a few of them where it would have shown deductions being withheld from their wages. And then there would have been the vast majority where deductions were not being held. That's what was happening. And that's what the CDC project manager and the Department of Labor expert witness who testified said that would have raised a red flag. That would have prompted an inquiry. And the testimony from the Department of Labor expert was that the Department of Labor would have had a duty, not just that they would have. They would have had a duty to go determine why that was happening, why workers who were doing the exact same job were being treated differently. On the materiality issue, Ms. Wiles' position, as I understand it, is it's only a material if the DOL, after doing the investigation, would have found there was a violation. I understand, at least your brief, perhaps your argument as well today, to be that materiality means there would have been an investigation and it would have been halted pending the investigation. Now, what's the law on that? Why should the fact that there would have been an investigation be enough for your side without us delving into what the result of the investigation would be, which I don't know how you can. That's correct, Your Honor. That is our position. And it's because for materiality, a statement is not required to, in fact, influence. In other words, courts have read into the materiality crime of 1001, not a requirement that the agency actually relies on a statement. It doesn't even require that the agency sees the statement. The point is, is it capable of influencing those agencies? And cases have held that one way it can influence an agency is by concealing the truth and lulling it into inaction. So the action that both agencies would have taken here had they known the truth, they couldn't do that. And frankly, without an investigation, we can't get to the bottom of whether there was, in fact, a violation. We don't know if the law was broken in any number of different ways separate from 1001 based on what they were, in fact, doing. Because the Department of Labor and the CDC were not allowed to go in and review the payroll records, to interview the employees, to see what it was they were actually doing. They were prevented from doing that by the false statements themselves. So Ms. Weil has talked about some of our prior cases, including Blankenship. How is this not a situation where it's – jurisdiction does not simply follow federal money? And she's saying Blankenship, the DOT could have shut down the project. If we accept your argument here, how have we not now said, well, in fact, jurisdiction does simply follow federal money. That any time there's a federal contract, there's jurisdiction. Two responses to that question, Your Honor. I want to address first just the factual differences between the record and the evidence that was before the court in Blankenship and what was presented at trial in this case. And separately, I don't read Blankenship and Lowe and the other cases of the Eleventh Circuit as inconsistent with each other like the defendants do. But first, I think just at a high level, there are some key differences between just the projects at issue in Blankenship in this case. In Blankenship, you had a state project run by a state agency. In this case, you have a federal project run by the CDC. Well, it was a Florida Department of Transportation receiving federal funds. That's correct, Your Honor. The Florida Department of Transportation did receive funds in Blankenship, but that was a Florida project run by the Florida Department of Transportation. In that case, the Florida Department of Transportation contracted with and oversaw the general contractor. Here, the CDC, the federal agency, contracted with and oversaw the project. In that case, there was no indication. Now, there were a couple different types of false statements in Blankenship, one of which the opinion indicates were payrolls similar to the wage and hour statements in this case. But there was no indication that those payrolls were ever intended to or, in fact, were sent to the U.S. Department of Transportation. In this case, they were required by, sent to, and reviewed by the CDC. And I think Your Honor is keying in on an important point in Blankenship that that case was really a funding case. There was a grant to the Florida Department of Transportation, but that grant did not necessarily relate to the specific project they'd issue. In this case, the CDC was overseeing this federal project where the defendant's workers were going every day for more than a year. And given those distinctions, I think it's not that surprising that, and I'll quote the court's language here, because I think it is unique in the lack of evidence regarding the U.S. Department of Transportation's power and authority to act in the case that was really, truly before the court. The court said that the uncontradicted testimony in that case was that the U.S. Department of Transportation dealt exclusively with the Florida Department of Transportation and looked solely to the Florida Department of Transportation. And that was what the court called a unique and indirect lack of authority by the U.S. Department of Transportation in that case. And the court was relying on Rogers, which says we're not going to construe 1001 narrowly. It should be construed broadly. And when we construe it broadly, we look to whether the agency has the ability and the authority to act in a given situation. And the stark contrast between the lack of evidence there and here, the contract itself said, and this is Government's Exhibit 70 on page 37, that the contractor had to keep all of these certified payrolls that the CDC was receiving for three, or excuse me, BECC was receiving for three years. The CDC or the Department of Labor could interview employees. This is also page 37. The failure to submit records would be grounds for debarment from both this project and any other federal project in the future. And the defendants by their own testimony in this case said that they worked on many, many, many different federal projects. And it's not just the contract. The contract said all of that, but there are also statutes and regulations that require those provisions to be in the contract. And separately, if there was not a contract, certified payrolls are still required by statute and regulations on federal government contracts. 40 U.S.C. 3145 prescribes that the Secretary of Labor shall prescribe regulations that require statements regarding wages paid. And it specifically says that those statements regarding wages paid on federal government contracts should be subject to 1001. And we've cited these provisions in our brief, so I won't go through each of the Department of Labor provisions that requires this. Is there anything about the CDC that makes it different from any other entity of the federal government? Is it a, you know, there's TVA, which is an authority, a corporation under a statute, arguably part of the federal government. Sometimes it seems like it, sometimes it doesn't. But is there something about the CDC's existence that sets it apart from, say, somebody building a building for the Commerce Department? No, Your Honor. The CDC is an agency of the Department of Health and Human Services. And there was testimony during trial that the CDC and other federal contracting agencies were required to collect these certified payrolls. So these certified payrolls are required on any federal government contract. In this case, the CDC was the federal contracting agency because it was a project for the CDC. So that's your argument distinguishing Lowe pretty much, isn't it? Yes, Blankenship, Your Honor. And I would note that Lowe, which is the first case in the former Fifth Circuit that the majority relied on in Blankenship, that was before the court, not on sufficiency of the evidence after trial, but that the indictment had not adequately pled the element of jurisdiction. And what the court said was that in that case, you had an employee who just told his or her employer that they worked on a Tuesday when they didn't. I don't know if that's the exact facts, but that they worked some period of time when they didn't. And what the court said was just because that company who that employee lied to happened to receive federal funds, we have no indication that the federal agency had any authority to act. It was just, as Your Honor put it, it was following the funds with nothing else. And what the court said was alleging that alone was not sufficient. And there was a concurring opinion in that case that noted that had the indictment alleged that that agency had the power to come in and do something, that would have been sufficient. That would have satisfied the element of jurisdiction in that case. The key or core language, I thought, Lowe, was the defendant's employment was derived from his private contract with a private corporation. The misrepresentation of the hours work was made to an employee of a private corporation under an arrangement where the wages were to be paid by the corporation. Here you're saying that everything was to be paid by the CDC through the contractor to the employees or independent contractors, whichever. Yes, Your Honor. And just to be clear, the money doesn't have to, there doesn't have to be funding. There's, of course, all manner of 1001 cases that don't involve funding. If you lie to a federal agent, that's a violation of 1001. But you're correct that our argument is that this is a far, far different situation than Lowe and Blankenship. In this case, the false statements would not have even been required. There would be no certified payrolls were it not a federal government contract. Was there any testimony in trial about what the F stood for in that other list? Yes, Your Honor. There were three office workers who worked in the defendant's office who testified at trial, and there were payrolls. So you had a list of payrolls, and you had one list, and this stack was about this high. That was what the defendants called CDC FK. And you had another pile that was much smaller that was CDC RL. And the workers, at least one worker, I can't recall specifically which one, but one worker testified that FK stood for fake. Certainly, the jury was entitled to infer that it stood for fake when it was as compared to W2. It wasn't just RL. W2 at the top of the spreadsheet that lists these employees said R-E-A-L. And the defendant's bookkeeper was instructed to create these payrolls separately. And the payrolls that he created were FK and RL, referring FK to the employees who they were not reporting to the IRS and who were not, in fact, having taxes withheld from their wages, even though they said on the certified payrolls that they were. And the handful of employees who they actually did report to the IRS, who they actually did deduct wages from. Do you want to take a couple of minutes? I'll let Ms. Wilde run over a couple of minutes. We'll give you an extra two to discuss the calculation of loss amounts. So Ms. Wilde will be able to discuss it in her reply. Thank you, Your Honor. Yes, I appreciate that. So the evidence of the loss in this case, the loss as a starting point as the PSR— He had one minute left, so give him three. One plus two. Thank you, Your Honor. The loss in this case as a starting point, as the PSR found, the loss is the $5 million that was paid out across 34 different federal contracts, where the defendants lied like they did to the CDC. And that's the starting point for loss is the $5 million. Now, the defendants objected to that PSR and claimed that they should get a credit for loss. The government didn't dispute that. That they shouldn't get some level of credit for that loss. In other words, that they did provide work on these different projects. The point is that that loss is not necessarily zero just because they provided the work across these contracts. And the CDC manager pointed out that they would not—this money would have been paid out but for the defendants' lies. But for those lies, they would have stopped payment, they would have done an investigation, and nobody would have been paid. And so we agree that the net loss after giving the defendants some level of credit for loss is not $5 million, but it's not zero. And that—it's difficult to put a number on that. It's difficult to come up with a precise amount for what the delta is there. And the court recognized this in going to the gain when it was not able to come up with a precise termination loss given the evidence that was available to it. And there was no evidence before the court about the manner in which they got these other contracts. The government actually put on a witness, and it really inured to the defendants' benefit because the government put on a witness that testified about the amounts that the defendants had invoiced on these different projects and the amount of profit that they got on each of those projects. And so it was the government's witness who actually proved up the credit against loss, and that inured to the defendants' benefit in this case. And what the court then did was took a conservative and reasonable estimate of the gain. He cut that in half to account for overhead or anything else, and that is what the guidelines require. They require a court to make a reasonable determination based on the information available to it. Now, why did he cut it in half? So based on the defendants' internal documents, they had these projects that indicated what they had billed, and then they identified their profit margin. And the defendants had argued they put on one witness whose only testimony was premised on false tax returns, and he admitted that. So that was the only evidence the defendants put on. And so you had a profit margin of, say, 23 percent across the different projects. And the court said, I hear you, defendants. You're arguing that some of that might be overhead. You might do different things. That's not truly your profit. And the court said, even if I cut that in half, you're still going to be within the same guidelines enhancement range. Cut the profit in half. Yes, Your Honor. So we took it from 20. So you take the $5 million. Instead of taking 23 percent to reflect their gain, the court only took 11.5 percent, and that still put them in the same range. In other words, they did not receive a greater – they would not have received a greater punishment even if the court went anywhere in that range between an 11.5 and 23 percent. And I see my time is running down. We would just ask that the court affirm both the defendants' convictions and sentences. Thank you. Thank you, counsel. Ms. Weil, if you could say something about the loss calculation. Yes, Your Honor. There was no loss in this case. Let me make clear to the court that I know that the CDC witness testified that he would halt the project. He also testified that he had received a stack of, I think it was 52, certified payrolls that showed 1099s in them. He said he didn't halt the contract. He didn't stop work on it. And he also said he didn't even know what 1099 meant. So, Your Honor, this case is no different than Lowe. The distinctions being made – You're not going to discuss the sentencing issue for me? Oh, yes. I'll continue to talk about it. I think you may have a point there. You may not. I'd like to hear what you've got to say about it. Yes, Your Honor. As to the loss amount, there was no loss in this case. Actual loss under 2B1.1 means the reasonably foreseeable pecuniary harm that results from the offense. Intended loss means pecuniary harm that the defendant sought to inflict. There was no harm. First of all, the CDC had entered into a fixed $65 million contract with fixed amount it was going to pay for drywall workers. And that was it. It did not go back and look and see anything else about what was going on. It said, Beck, have at it. You deal with it. It did not have anything to do with any of the workings of what was going on. So, there was no harm. It wouldn't – Government's theory – I saw it somewhere. It wasn't in a brief. It was in the district court. It was that the real harm here is to the bidding process on the theory that they were able to underbid the competitors. And that's – than it would have had they not engaged in this, quote, fraudulent, end of quote, activity. Anytime you underbid, the cost to the bid awarder is less than if you didn't underbid. There was – How wrong about that? Was there a theory somewhere along the way? Yes, Your Honor. And what I was trying to explain earlier also, there was no fraud in the bidding process because every single drywall worker who works on these projects – and I would challenge the government to go look at every single government contract going in. They are independent contractors. There is no drywall. And that was what Boudreau – And if we wanted to verify that statement that you made in the record, where would we go in the record? Boudreau testified. That's how it works. He said that generally with respect to all workers who work on these government projects because what happened in this case is – The jury could have credited or not credited his testimony. Correct. That is correct. In fact, you know, the line of cases, it's a strong line. They could find the opposite of what he testified to after observing his demeanor. And you're asking me now about sentencing. And it was presented at sentencing, and it is, in fact, a fact that the drywall contractors are independent. The fact that we can't ignore Boudreau or the reality of the situation is that it wasn't going to change. They are going to enter into – and they did. As I mentioned, they had forms that said there were 1099s on them. And CDC did nothing, which goes both to loss and to jurisdiction. Because what happened in this case is that there was a private contract. Pursuant to the terms of the private contract, they had to comply with Davis-Bacon, which was what these forms were. They were accurate under Davis-Bacon. When the government keeps talking about they would have called the Labor Department, there is evidence in the record. The only evidence was there was no Davis-Bacon. Everybody agreed Davis-Bacon was not violated. It wasn't even charged because it wasn't violated. Labor Department wasn't. Thank you, counsel. Thank you. Any further argument? We'll take up Travelers' Indemnity v. McKenzie et al. Thank you.